AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
2015 SEP 14 AM 11: 19
US DISTRICT COURT
SOUTHERN DIST OHIO
WESTERN DIV DAYTON

| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. 3 : 15 mj - 360 |
| 1229 Sunnyview Avenue, Dayton, Ohio | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. s. 666 | (theft or bribery concerning programs receiving federal funds |

The application is based on these facts:

See Attached Affidavit of Special Agent Lance Kepple

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Lance Kepple, Special Agent of the FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9-14-15 _____
*Judge's signature*

City and state: Dayton, Ohio

Sharon L. Ovington, Chief US Magistrate Judge
*Printed name and title*

**AFFIDAVIT**    *3:15mj-360*

I, Lance R Kepple, being duly sworn, hereby state:

I.

**INTRODUCTION**

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, Cincinnati Division.  I have been employed as a Special Agent with the FBI since September 1999.  I have received training in organized crime, fraud, drug trafficking investigations and have participated in numerous related arrests and convictions, related surveillance, investigations involving the distribution of narcotics and conspiracy to distribute narcotics, money laundering offenses, supervised the activities of informants who have provided information and assistance which resulted in seizures, arrests, and convictions.  Based on my training and experience, I am familiar with federal laws, and I am aware that it is a violation of federal law to commit bribery of public officials concerning programs receiving federal funds. Additionally, I have received training in the investigation and prosecution of public corruption offenses.

II.

## PURPOSE OF THE AFFIDAVIT

2.    I make this affidavit in support of an application for a warrant to search the following premises as there is probable cause to believe that evidence of a crime, contraband or fruits of a crime, and property designed for use, intended for use, or used in committing a crime – namely, violations of: 18 U.S.C. § 666 (theft or bribery concerning programs receiving federal funds) – exists and can be found at the following location:

a.    The residence located at **1229 Sunnyview Avenue, Dayton, Ohio**, including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location.  1229 Sunnyview Avenue, Dayton, Ohio is more fully described in Attachment A, and Attachment A is incorporated herein by reference.

3.    This affidavit is intended to show that there is sufficient probable cause for the above-described search warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter.  The facts and information contained in this affidavit are based on my personal knowledge, my training and experience, my interviews of various witnesses, including law enforcement personnel who participated in the

investigation, and my review of certain records, documents, and audio-visual recordings.  Moreover, the use of quotations to describe conversations herein either identify the actual words of the speaker or the interpretation of those words by law enforcement.

### III.

### ITEMS TO BE SEIZED

4.   A list of the specific items to be seized from the above-described premises is attached hereto as Attachment B, and Attachment B is incorporated herein by reference.

5.   Based on my training and experience, as detailed above, I believe that there is probable cause to believe that the items listed in Attachment B will be found at the above-described premises.

### IV.

### SUMMARY OF PROBABLE CAUSE

A.   Introduction

6.   With a population of approximately 141,527 as of the 2010 United States Census, the City of Dayton is a local political subdivision of the State of Ohio that receives annually millions of dollars in funding from the United States. For instance, based on information from the Ohio Auditor of

3

State, during 2012, the federal government provided the City of
Dayton millions in federal funds, including: approximately $23
million from the United States Department of Housing and Urban
Development ("HUD"); approximately $19.8 million from the United
States Department of Transportation ("DOT"); and $2.6 million
from the United States Department of Justice. The United States
provided the city with an additional $28.8 million in funds
during 2013, including approximately $12.7 million from DOT and
$13.6 million from HUD. Although the Ohio State Auditor has
not released its audit of the City of Dayton for 2014, the City
Commission released a PowerPoint Presentation during January
2015 entitled: "Investing for Tomorrow: 2014 Investment
Highlights City Manager's Recommended 2015 Investment Plan."
According to this presentation, during 2014, the City of Dayton
received approximately $4.7 million in federal grants and $1.4
million from HUD. During 2015, the presentation estimates that
the City of Dayton will receive $10.25 million in federal grants
and $1.8 million from HUD. Moreover, based on my training and
experience, I know that city government's such as Dayton
annually receive federal funding exceeding $10,000.

7. Based on publicly available information, including the
City of Dayton's own public website, a City Commission comprised
of five members -- namely, the mayor (currently, Nan Whaley) and

4

four elected commissioners (currently, Joey Williams, Dean
Lovelace, Matt Joseph, and Jeffrey Mims) -- governs the City of
Dayton.

8.   CityWide Development Corporation ("CityWide") is a
non-profit entity that constitutes a component of the City of
Dayton.  According to the publicly available Independent
Auditor's Report of the City of Dayton, prepared by Plattenburg
& Associates, Inc., for the audit period January 1, 2013 through
December 31, 2013, CityWide:

> was established in 1972 as a private, non-profit
> development organization which supports the City in a
> number of ways - primarily as its development financing
> arm. CWDC's relationship with the City is established via
> its stated mission: fostering economic development through
> creating and retaining jobs for City residents, providing
> administrative support to assist in neighborhood
> development, increasing tax revenues, and improving the
> Dayton area economy. Because the City appoints all members
> of CWDC's Board of Trustees and is empowered to remove them
> at will, CWDC is a component unit of the City.

CityWide's public website further elaborates on its mission for
the City of Dayton.  In particular, "[o]ver the past three
decades, CityWide has helped hundreds of businesses expand,
renovate or open in Dayton. . . .  CityWide has also
participated in many programs and projects designed to
strengthen Dayton's neighborhoods.  These have involved the
financing of the construction of new homes, the renovation of
older homes and general home improvements."  Given its role,
CityWide routinely awards thousands of dollars in contracts to

private companies for the demolition of certain homes within the limits of the City of Dayton.

9.     During early 2013, the FBI began investigating allegations that a Dayton-area businessman not only had engaged in fraud but also had bribed local officials in exchange for receiving federally funded demolition contracts in the Dayton metropolitan area.  While investigating this matter, the FBI developed two Confidential Human Sources ("CHS"), identified hereinafter as CHS-5 and CHS-8.  Operators of a private demolition company in the Dayton metropolitan area, CHS-5 and CHS-8 have proven reliable and have provided accurate, truthful information to the FBI in the past.  For instance, the FBI has been able to verify from independent sources various statements and information that it has received from CHS-5 and CHS-8.  It should be noted that CHS-5 and CHS-8 both have agreed to cooperate with the FBI in part to minimize their individual exposure to potential criminal charges for their respective roles in a scheme to defraud local government entities.  CHS-8 has sustained no criminal convictions.  CHS-5 has been convicted of misdemeanor offenses in the state of Alaska during the 1980s. Additionally, CHS-5 and CHS-8 have received monetary payments from the FBI.

B. __CHS-5 Meets City of Dayton Commissioner Joey Williams__

10. During August 2014, Brian Higgins -- a local businessman in the Dayton area -- represented to CHS-5 that he, Higgins, had access to various City of Dayton officials. In particular:

a. During that month, Higgins requested that CHS-5 complete a repair estimate in connection with an insurance claim on damages at Higgins's personal home. While preparing this estimate in mid-August 2014, CHS-5 and Higgins engaged in a conversation concerning the demolition business. While doing so, Higgins volunteered that he had contacts with various government officials, including Mayor Nan Whaley and City Commissioner Joey Williams. Higgins indicated that, given his access to these officials, he could help CHS-5's business.

b. On or about August 19, 2014, CHS-5 provided paperwork to Higgins related to the insurance claim. Around this time, Higgins requested that CHS-5 become the general contractor on the repair work at Higgins's house; Higgins indicated that he wanted CHS-5 to complete only a portion of the work and provide the remainder of the insurance funds to Higgins. In pitching this idea to CHS-5, Higgins again reiterated that he could introduce CHS-5 to City Commissioner Joey Williams and other government officials; Higgins again

indicated that these introductions could help CHS-5's demolition business.

11. Consistent with his representations, during late August 2014, Higgins arranged two separate meetings between City of Dayton Commissioner Joey Williams and CHS-5. In particular:

a. During the first meeting, which was generally social in nature, Higgins introduced CHS-5 to Williams. During the second meeting, however, Higgins and Williams pitched CHS-5 to invest in a restaurant with them. Williams indicated that his name would have to stay off any paperwork for the proposed venture to avoid conflicts of interest with the City of Dayton. (Around this time, CHS-5's business had been attempting to bid on City of Dayton contracts). To that end, Williams suggested that he would use his wife's name on any documents concerning the proposed restaurant. Ultimately, CHS-5 declined to invest in the venture.

b. Between this first and second meeting, CHS-5 engaged in a series of consensually recorded conversations with Higgins concerning Williams. During these discussions, Higgins advised CHS-5 to keep Williams close as Williams could provide valuable information to CHS-5. Higgins further told CHS-5 that a time would come when CHS-5 would have to pay Williams and that, when that moment occurred, CHS-5 better not hesitate in

making the payment.   In that vein, Higgins explained that he believed that a Dayton businessman who had received numerous contracts from the City of Dayton had paid for Williams's Cadillac.

## C.   CHS-5 Seeks Assistance from Williams in an Effort to Obtain Contracts with the City of Dayton.

12.  During late summer 2014, CHS-5, through his business, submitted what was later determined to be the lowest bid for a demolition contract with City of Dayton (hereinafter "Pending Contract").  During mid-January 2015, an employee from the City of Dayton advised CHS-5 that his company would not be awarded the demolition contract even though it had submitted the lowest bid on the project.

13.  Shortly thereafter – namely, on or about January 20, 2015 – CHS-5 participated in a consensually recorded call with Higgins.  When CHS-5 apprised Higgins that CHS-5's business had not been awarded the city contract, Higgins indicated that CHS-5 should speak to Williams.  (To that end, Higgins ultimately sent a text message with Williams's contact information to CHS-5).  Higgins further represented that he would apprise Williams of the forthcoming contact from CHS-5.  Using the contact information that he had received from Higgins, CHS-5 called Williams, and they agreed to meet one another for breakfast on January 23, 2015.

14.   On or about January 23, 2015, CHS-5 participated in a consensually recorded meeting with Williams at a restaurant in Dayton, Ohio.   During their ensuing discussions:

a.   CHS-5 explained to Williams that he (CHS-5) and his business were having difficulties securing contracts with the City of Dayton.   After reiterating that his company had submitted the lowest bid on a recent contract, but still had not received it, CHS-5 suggested that one of his competitors may have supplied negative information about his business to the City of Dayton.

b.   As their conversation shifted to several general topics, CHS-5 mentioned in passing that he also operated a drywall company.   Soon thereafter, Williams indicated that he had a home improvement project that he needed to complete at his personal residence.   Stating that he wished to enclose a covered patio at his home, Williams proceeded to draw a sketch of the proposed project.   Williams then wrote his address on the sketch and provided the drawing to CHS-5.   CHS-5 indicated that he could handle Williams's project.

c.   After opining on the federal money that flowed into the City of Dayton, Williams stated that he would work on CHS-5's problem and contact a city employee, Crosby.   (Based on my familiarity with this investigation as well as my review of

10

subsequent conversations between CHS-5 and Williams, I believe that Williams was referencing Catherine "Caty" Crosby, the executive director of a City of Dayton component known as the Human Relations Council.) Before the meeting ended, CHS-5 showed paperwork to Williams and indicated that CHS-5 had received these documents, one of which was a confidential City of Dayton paper, from a city employee.

15. On or about January 23, 2015, following the breakfast meeting, Williams called CHS-5. This telephone conversation was not recorded. During the call, Williams advised that he was working on CHS-5's problem with the City of Dayton. He further admonished CHS-5 to keep their conversations in strict confidence.

**D.** **At Williams's Direction, CHS-5 Begins Work on Williams's Home Improvement Project at a Substantial Discount.**

16. On or about January 28, 2015, during a consensually recorded telephone conversation, Williams and CHS-5 again discussed CHS-5's problems with the City of Dayton as well as Williams's proposed home improvement project. In particular:

a. Williams indicated that he had spoken to Caty (*i.e.,* Catherine Crosby) and would soon meet with the city manager concerning CHS-5's issues with the City of Dayton.

According to Williams, it appeared that the City of Dayton was denying contracts to CHS-5 without any documented reason.

b.    After CHS-5 indicated that he had stopped at Williams's home and taken measurements for the project discussed during their breakfast meeting, Williams indicated that, while he liked a deal, the CHS-5's situation with the City of Dayton was messy.  Williams then inquired whether CHS-5's business or some other entity would perform the home improvement project at his (Williams's) home.  When CHS-5 advised that the work could be performed under the name of another entity, including a company that belonged to Higgins, Williams responded that he wanted to keep things separate (*i.e.*, he did not want CHS-5 and Higgins knowing about each other's respective dealings with Williams).  Williams tacitly explained that, given his position, his actions were watched.  Williams then informed CHS-5 that he (Williams) disliked having received a recent text message from Higgins in which Higgins expressed knowledge that CHS-5 was performing some work for Williams.  Williams reiterated that he was paranoid and liked to keep his dealings quiet.

c.    Williams again explained that he planned to work on CHS-5's problems with the City of Dayton.  When CHS-5 indicated that he would have the plans for the proposed home

improvement project completed soon, the men agreed to meet at Williams's home on Friday (*i.e.*, January 30, 2015).

17.  On or about January 30, 2015, CHS-5 participated in a consensually recorded meeting with Williams at Williams's residence – namely, 1229 Sunnyview Avenue, Dayton, Ohio.  During this meeting:

    a.  Williams explained that he had spoken to the City of Dayton's Assistant City Manager, Shelly Dickstein, and that she had provided him with specific information concerning negative feedback that the city had received concerning CHS-5's company.  Williams indicated that Dickstein planned to talk to CHS-5 concerning the matter at a meeting that also may include Caty Crosby, or someone else from the Building Services Group. Williams advised that he was aware of a similar situation that had occurred with another business and that, after meeting with City of Dayton officials, the company was able to obtain some contracts with the city.  Williams questioned why the City of Dayton just did not meet with a company as a step in the process (*i.e.*, attempting to address the negative feedback) and would do so only after a commissioner became involved with the issue.

    b.  The two men then discussed William's home improvement project.  Williams explained that, from his perspective, he already had mentioned his home improvement

13

project to CHS-5 before CHS-5 had broached his inability to
obtain contracts with the City of Dayton.  Williams stated that
he would have "some cover" if they already had discussed his
(Williams's) project (i.e., before they discussed CHS-5's
problems obtaining contracts the City of Dayton).  Williams
indicated that the matter should never come up, but if, in the
event that it did, he (Williams) would always say that they had
already talked about his (Williams's) project first.

c.   Williams then asked CHS-5 how much his home
improvement project would cost if he were not receiving the
"friendly deal for Williams' house."  In response, CHS-5
explained that, if CHS-5 did not complete the project at CHS-5's
cost, the improvements would run Williams between $22,000 and
$23,000.  Williams responded:  "Okay."  Williams explained that,
on a previous occasion, he had received an estimate ranging from
$5,000 to $15,000 to complete the project, but conceded that
CHS-5 would be performing more work than the previous plans.

d.   CHS-5 then referenced an item in Williams's home
that appeared to be expensive.  Williams responded:  "Well, you
know I have friends."

e.   Returning to the home improvements, Williams
indicated that he had believed that the job would cost from
$7,500 to $10,000 and, as such, wanted to talk to his wife

14

before proceeding.   Williams also stated that he wanted to think over what was fair and what made sense.

     f.   The discussion then turned to who should know about CHS-5's potential work as Williams's home.  When CHS-5 suggested that there should not be any paperwork on the project, Williams replied: "Um huh."  CHS-5 then indicated that they (he and Williams) should probably keep their dealings private. Williams responded: "Great."

     g.   Williams once more reiterated that he wanted the City of Dayton to be fair with CHS-5.  He indicated that the City of Dayton should provide CHS-5 an opportunity to fix the alleged problems with his company so CHS-5's company could have a shot at some business with the City of Dayton.

    18.  On or about February 18, 2015, CHS-5 participated in a consensually recorded meeting with Williams at Williams's residence – namely, 1229 Sunnyview Avenue, Dayton, Ohio.  During this meeting, Williams accepted a substantially discounted price for the home improvement project and, in return, agreed to continue to assist CHS-5 address his problems with the City of Dayton.  More precisely:

     a.   CHS-5 presented Williams with two proposed invoices.  Invoice #1 totaled approximately $23,000, including

$8,500 for labors costs with the remaining balance largely reflecting the use of high end materials. Invoice #2 totaled approximately $19,000, once more including $8,500 in labor costs with remaining balance reflecting the use of standard materials. Placing Invoice #1 and Invoice #2 before Williams, CHS-5 detailed the differences in each potential proposal – namely, the quality of the materials. Pointing only to the cost of materials on the invoices, CHS-5 explained that Williams only would have to pay for that portion of the project. Directing Williams's attention to the cost of labor – namely, $8,500 – CHS-5 indicated that was what he was able to do for Williams (*i.e.*, what CHS-5 was willing to provide to Williams for free). CHS-5 stated: "I'll go any way you want to go." Williams then pointed to the cost of materials on Invoice #2 and replied: "I like the sound of this." CHS-5 advised Williams that Williams should not "beat himself up" for helping CHS-5 because CHS-5's company was doing well.

   b.   The discussion then shifted once more to CHS-5's issues obtaining contracts with the City of Dayton. Williams explained that CHS-5 would hear from someone at the city soon. When CSH-5 indicated that, "if it's going to happen, it will," Williams replied: "It's gonna happen." Williams informed CHS-5 that he (Williams) had been in contact with Caty Crosby and

Shelly Dickstein.  Williams explained that Crosby, whom he
identified as a good friend of his wife and him, worked on the
Human Relations Council.[1]  Williams then expanded on the role
that the Human Relations Council played in the bidding process
on contracts with the City of Dayton.

          c.  As their conversation progressed, Williams
indicated that he had been apprised of allegations that CHS-5
had bribed someone in the past.  More precisely, Williams
explained that, in confidence, Shelly Dickstein had advised him
that CHS-5 had been accused of bribery on a previous job
(presumably in relation to a government contract).  Williams
indicated that he wished CHS-5 to be aware of the allegation.
In response, CHS-5 explained that he "grew up in the . . . world
[of a businessman in Dayton long rumored to have bribed public
officials], and I know what it takes to make a business grow."
Tacitly admitting the truth of Dickstein's allegation, CHS-5
advised Williams:  "I'm not saying that didn't happen."
Williams replied: "We [*i.e.,* public officials] are all so
paranoid now."

_____

[1] According to the City of Dayton's public website, the Human
Relations Council is a subdivision within the city's government
that reports directly to the City Commission.  As detailed on
the website, the Human Relations Council serves many functions,
including:  "provid[ing] business and technical assistance to
minority-owned, woman-owned and small disadvantaged businesses."

d.   Once more, CHS-5 again informed Williams of the price of the project, excluding the cost of labor.  When Williams advised CHS-5 to let him know if he needed a money draw, CHS-5 responded that it was up to Williams whether to put money down on the project.  CHS-5 indicated that he would begin work on the project in roughly three weeks.  Williams and CHS-5 agreed to generate no paperwork for the deal.

e.   As the meeting concluded, CHS-5 thanked Williams for his efforts in resolving CHS-5's issues obtaining contracts with the City of Dayton.  Williams confirmed that CHS-5 shortly would receive a call from the City of Dayton; Williams explained that he intended to "casually" ask Crosby about it.  When CHS-5 once more referenced the Dayton-area business man long rumored to have bribed public officials, Williams responded that the businessman had been successful because the businessman had a "friend, McLin (*i.e.*, former City of Dayton Mayor Rhine McLin)." Williams advised CHS-5: "You got a friend too."

E.   **While Continuing to Receive Substantial Benefits from CHS-5, Williams Exerts His Influence with the City of Dayton in an Effort to Obtain Contracts for CHS-5's Business.**

19.   Over the next several months, CHS-5 and his company worked on the improvement project at Williams's home. Throughout this time, Williams repeatedly made requests for CHS-5 to perform additional work on his residence, adding thousands

of dollars in expenses to the original home improvement project. Williams also continued to make assurances to CHS-5 that CHS-5's company would ultimately obtain contracts with the City of Dayton.

20.   For instance, on or about April 2, 2015, CHS-5 participated in a consensually recorded meeting with Williams at Williams's residence – namely, 1229 Sunnyview Avenue, Dayton, Ohio.  During this meeting, Williams confirmed his efforts to obtain contracts with the City of Dayton for CHS-5's business. Most notably:

       a.   CHS-5 inquired if Williams had spoken to Crosby concerning CHS-5's issues obtaining contracts with the City of Dayton.  In CHS-5's presence, Williams sent a text message to Crosby asking if she was available to speak with him; Williams also telephoned Crosby, but the call went to her voicemail. During this process, CHS-5 explained to Williams that CHS-5 was curious concerning what Crosby had to say about the prospects of CHS-5's company obtaining business with the City of Dayton.

       b.   Soon thereafter, Williams received an incoming telephone call from Crosby.  (Notably, Williams instructed CHS-5 to remain quiet).  Answering the call and placing it on speakerphone, Williams ultimately had the following exchange with Crosby:

19

WILLIAMS: I just wanted to follow-up with you, about three or four weeks ago or maybe even longer now, I had talked to you about that one company, [CHS-5's company]. And, I think you had put RoShawn[2] on that. I was wondering how, how's that coming along, is he, are they making some progress?

CROSBY: Yeah, I need to touch base with RoShawn but what we ended up with is that they were supposed to send us a list of all of their projects and then we were going to do a survey to get the feedback from the project owners. And then where we found there were deficiencies we'd create a technical assistance plan. Um, we would create a technical assistance plan to work on those deficiencies. I don't believe that they have, um, I don't think they've sent that information over yet. Um, and then the other thing is RoShawn came to me this morning because, um, Shelly was going to talk to Citywide about some of the smaller projects that they have, um, and see if we can connect, um, see if we connect [CHS-5's company] and Citywide, so they can get some experience to develop a reputation to work on our smaller projects. But those were the two things that were supposed to, um, be doing. And, I know that RoShawn, he actually left me a message this morning asking if Shelly had talked to Citywide, um, and I know she has not talked to Citywide. But, I . . .

WILLIAMS: Well, stay on her. If I need to jump in you let me know. Shelly has another thing she's supposed to do for me on another issue. So, I hope Shelly isn't starting to fuck up.

CROSBY: Okay.

WILLIAMS: I appreciate that, just keep me informed.

_____

[2] Based on my familiarity with this investigation, Williams was referring to RoShawn Winburn, an employee of the Human Relations Council. It should be noted that Winburn had solicited bribe payments from CHS-5 in an exchange for his efforts to influence, among other things, the awarding of contracts with the City of Dayton.

c.   After the call ended, CHS-5 thanked Williams for his assistance.  Williams replied:  "Yeah, let's get it going." Williams further indicated his happiness that Crosby was "already on the case when I called her."

21.  On or about, April 6, 2015, CHS-5 participated in a consensually recorded meeting with Williams at Williams's residence – namely, 1229 Sunnyview Avenue, Dayton, Ohio.  During this meeting, Williams and CHS-5 discussed the cost of, and payment for, the now-expanded project at Williams's home.  In particular:

a.   Williams provided CHS-5 a check in the amount of $6,000 – the only monetary payment that Williams ultimately would give to CHS-5 for his work at Williams's house.  CHS-5 explained however, that, with Williams's requested additions to the project, the cost of services and materials now exceeded $40,000.  In response, Williams offered to pay a total of only $11,000 for the project.

b.   Williams then proposed that he and CHS-5 settle through a trade the remaining $5,000 (*i.e.*, $11,000 less the $6,000 check).  More precisely, Williams indicated that he would give CHS-5 a designer cat house (a picture of which is attached hereto as Attachment C) and, in return, receive a $5,000 credit towards his remaining payment.  Williams explained that he had

21

acquired the cat house for $1,000 at a charity auction, but opined that it may have been worth up to $10,000. CHS-5 agreed to Williams's request and accepted the cat house as payment.

22. On or about April 10, 2015, CHS-5 received a telephone call from a CityWide employee who identified herself as Nicole Steele concerning CHS-5's business performing work for this arm of the City of Dayton. In particular:

a. During the conversation (which CHS-5 did not record because he was unfamiliar with the incoming telephone number), Steele advised that someone high up in the City of Dayton had recommended CHS-5's company for a potential project with CityWide. When CHS-5 inquired who had recommended his company, Steele declined to identify the person. Steele proceeded to explain that CityWide was potentially interested in hiring CHS-5's company for a demolition project involving three properties on Salem Avenue in Dayton, Ohio. CHS-5 and Steele agreed to meet later in the day at the proposed demolition site.

b. Shortly after receiving the telephone call, CHS-5 proceeded to Williams's residence, where he spoke with Williams. During their ensuing conversation, CHS-5 advised Williams concerning the call from CityWide. Thanking Williams for taking care of him, CHS-5 indicated that he knew that Williams had prompted the call. Acknowledging his role in the process,

Williams responded that he knew everything would come together. It should be noted that CHS-5 attempted to record this conversation, but, unbeknownst to him, the recording device malfunctioned.

      c.   After speaking with Williams, CHS-5 met with Steele, the CityWide employee, at the proposed demolition site. While there, they discussed CHS-5's business performing the potential project for this component of the City of Dayton.

23.  On or about April 28, 2015, CHS-5 participated in a consensually recorded meeting with Williams at Williams's residence – namely, 1229 Sunnyview Avenue, Dayton, Ohio.  During this meeting, CHS-5 provided $10,000 in cash to Williams so that Williams could pay the subcontractors working on his home.  In particular:

      a.   CHS-5 used a number of sub-contractors to complete various aspects of Williams's home improvement project. CHS-5 and Williams agreed that, to create the appearance that William was paying for the project, Williams (not CHS-5) should hand deliver to the subcontractors any payments for their work.

      b.   Consistent with that understanding, CHS-5 delivered $10,000 in cash to Williams, which, in turn, Williams had agreed to use to pay the subcontractors working on his

house.  When providing the cash to Williams, CHS-5 explained the amount of money that Williams should give each subcontractor. Williams accepted the money, which he ultimately used to pay various subcontractors working at his residence.

24.  On or about May 4, 2015, CHS-5 participated in a consensually recorded telephone conversation with Williams concerning Wiliams's efforts to obtain work for CHS-5's business with the City of Dayton.  During this conversation:

a.  CHS-5 informed Williams that a city employee, Roshawn Winburn, had called CHS-5 and advised CHS-5 that city officials planned to meet concerning CHS-5's business.  Williams stated that CHS-5 already knew about what they (*i.e.,* the city officials) wanted to talk.  Williams explained his belief that someone had "sabotage[d]" CHS-5's business with the City of Dayton and that he, Williams, wanted city officials to know this fact.

b.  CHS-5 advised that he again had received a call from Nicole Steele of CityWide.  Although expressing his pleasure that someone from CityWide had contacted CHS-5, Williams indicated his surprise that Steve Budd (the President of CityWide) had not called CHS-5 personally.  Williams explained that he had "good conversation" with Bub (*i.e.,* a discussion with Budd indicating that CHS-5 business's needed

24

work with the City of Dayton).  Near the conclusion of his conversation with CHS-5, Williams stated: "Think we're doing right thing."

25.  On or about May 11, 2015, CHS-5 participated in a consensually recorded meeting with Williams at Williams's residence – namely, 1229 Sunnyview Avenue, Dayton, Ohio.  During this meeting, CHS-5 provided $3,100 in cash to Williams so that Williams could pay the subcontractors working on his home.  More precisely, the men had agreed that, to create the appearance that William was paying for the project, Williams (not CHS-5) should hand deliver to the subcontractors any payments for their work.  Consistent with that understanding, CHS-5 delivered $3,100 in cash to Williams, which, in turn, Williams had agreed to use to pay the subcontractors working on his house.  When providing the cash to Williams, CHS-5 explained the amount of money that Williams should give each subcontractor.  Williams accepted the money, which he ultimately used to pay various subcontractors working at his residence.

26.  On or about May 21, 2015, CHS-5 participated in a consensually recorded telephone call with Williams during which they discuss the City of Dayton, through CityWide, awarding a contract to CHS-5 business.  In particular:

a.    During their discussion, Williams stated:  "I just wanted to let you know that I talked to um, talked to her [*i.e.*, given the context of the call, likely Shelley Dickstein] last night, or at the meeting and um, she said that there was a um, there's nothing been done yet and it's going to due diligence."  Williams then explained that he questioned Dickstein concerning the delay, stating:  "I asked her does it usually take this long, I said it seems surprising to me that you're still working on this."  Williams indicated that, in response to his entreaties, "she just smiled and said we're working on it."  Williams offered his interpretation of the smile, stating:  "And I don't know if that's her way of saying, you know that she trying to make sure things are going to go how I want or what. We'll see."

b.    After listening to Williams, CHS-5 revealed that he just had received a call from Steele in which Steele on behalf of CityWide formally hired CHS-5's company to perform the Salem Avenue demolition project.  Williams can be heard clapping on the telephone call.  Williams then stated:  "That's me clapping, I'm really happy to hear that, good.  That's why she probably smiled.  She probably, she probably knew that and didn't want to say it she wanted to, cuz I asked her what's going on with the projects."

c.   In response, CHS-5 again thanked Williams, stating: "I appreciate 'em buddy.  You don't know, you don't even know. It means a lot to me, means a lot to me."  Williams advised CHS-5:  "Go in there and kick ass on the job."  CHS-5 told Williams not to worry and that he, CHS-5 would make Williams "look good."  Concluding the conversation, Williams stated:  "Well, I'm just, I'm just happy that you got the opportunity."

**F.   Williams Demands That CHS-5 Prepare a Fraudulent Invoice, Falsely Reflecting that Williams Paid for the Home Improvement Project.**

27.  On or about June 18, 2015, CHS-5 participated in a consensually recorded meeting with Williams at Williams's residence – namely, 1229 Sunnyview Avenue, Dayton, Ohio.  In particular:

a.   CHS-5 mentioned that, while working for a Dayton-area business owner, CHS-5 learned that the business owner had a relationship with former Dayton Mayor Rhine McLin.  Intimating that the relationship involved bribes, CHS-5 stated that he likely knew more about the interactions between the businessman and McLin than did Williams.  Williams agreed, stating: "You probably know more about it than I do."

b.   As the conversation progressed and touched on a lunch meeting that had occurred the preceding week among

Williams, CHS-5 and CHS-8, Williams stated: "Um, yeah, so I don't know. We got to talk about that. I wasn't comfortable with that." (During the lunch meeting, CHS-8 indicated that CHS-5's company would need millions of dollars in City of Dayton contracts to make up for the money that CHS-5 had spent on Williams's home improvement project). When CHS-5 indicated that he was sorry for CHS-8's comments, Williams stated: "It's not something . . . I've never done something like that."

  c. After CHS-5 explained that he and Williams had made things happen together, Williams stated: "As God is my witness though, there is nothing I have done for you . . . that I wouldn't have done had we never talked about this, I just want you to know that." Williams expounded: "Just so you know, I have been doing this for 14-15 years, I have never accepted a thing. And . . . uh . . . the only reason I did this is, I didn't realize what I was agreeing to when we started and it kind of blew up, and I said 'Fuck it.'"

  d. Williams then explained: "I just want to have . . . I just want a good conscience, myself. I am a Christian and I like to do things the right way. I don't want to have any . . . even . . . thoughts that I am doing something that I really shouldn't do. I'm also not perfect, I'm a sinner too. I'm not perfect."

e.  Williams then instructed CHS-5 as follows: "Also when we finish this thing, I need something that says paid in full, and you need to write it up for 35, 40 thousand dollars. Something that is within the ballpark what a deal like this would cost."  When CHS-5 indicated that he would comply with Williams's request, Williams stated:  "I want to make sure there is a paper trail and you never know, shit happens and you increase it.  One day, you and CHS-8 could get pissed at me."

28.  On or about June 30, 2015, CHS-5 participated in a consensually recorded meeting with Williams at Williams's residence – namely, 1229 Sunnyview Avenue, Dayton, Ohio.  During this meeting, consistent with Williams's request, CHS-5 presented Williams with a fraudulent "paid in full" invoice. More precisely, this invoice correctly reflected the total cost -- namely, $56,750.17 -- of the home improvement project at Williams's residence, including Williams's repeated requests for CHS-5 and his company to perform additional free work at the house.  This documented also properly reflected the lone payment of $6,000 in the form of a personal check that Williams paid to CHS-5 for the project.  However, to satisfy Williams's demand for a fictitious paid in full receipt, the invoice falsely represented that Williams had made a payment of $50,750.17 to

CHS-5 business on June 1, 2015.  Williams accepted the paid in full invoice at his residence.

**G.** **While Exploring the Possibility of Creating a Drywall and/or Home Construction Business, Williams Acknowledges to CHS-5 that He, Williams, Accepted a Cash Payment from a Businessman in Dayton.**

29.  Throughout August and September 2015, Williams had multiple telephonic and in person conversations with CHS-5 concerning Williams's efforts to create either a drywall or home construction business that could obtain certification as a disadvantaged business, such as a State of Ohio Minority Business Enterprise ("MBE").  (Based on my training and experience, I know that certain federal, state, and local contracts require that a disadvantaged business participate in the project).  Throughout these conversations, Williams indicated his knowledge that his ownership of a business that attempted to obtain business with the City of Dayton constituted a conflict of interest.  As such, Williams repeatedly explored the possibility of placing the business in another individual's name.

30.  On or about August 4, 2015, as part of this process, CHS-5 participated in a consensually recorded meeting at Williams's home – namely, 1229 Sunnyview Avenue, Dayton, Ohio.  During this conversation, Williams discussed apparent bribes that a Dayton area businessman had provided to public officials, including him.  (It should be noted that the Dayton businessman is the

same businessman referenced earlier in this affidavit).  More precisely:

    a.   Williams told CHS-5 that a Dayton businessman had given him money for campaign contributions.  Williams explained to CHS-5 that $500 was the ideal, single contribution and that he did not like to accept any more than that amount from a single campaign contributor.  Williams indicated that the Dayton businessman had his friends and employees contribute money (*i.e.*, the $500 amount) to Williams's campaign.

    b.   Williams then explained that, on one occasion, the Dayton businessman had given Williams an envelope containing $1,000 in cash.  Williams indicated that, after three or four days, he had given the money back to the businessman because he (Williams) did not feel comfortable keeping it.  It should be noted that a confidential source (identified hereinafter as CHS-7), who has proven reliable in the past, previously had advised the FBI concerning this incident, but with slightly different details.  In particular, according to CHS-7, the Dayton businessman had given Williams a single $5,000 cash payment within the last several years.  CHS-7 explained that Williams had attempted to return the money only after Williams learned that the Dayton businessman may have video recorded the payment.  According to CHS-7, the Dayton businessman refused to accept the

money back from Williams and that Williams ultimately kept the bribe payment.

c.    Before the meeting ended, Williams began to discuss fallout from a dispute between the Dayton businessman and the City of Dayton.  CHS-5 stated that he had heard that the Dayton businessman had donated thousands of dollars to the Mayor's campaign (*i.e.*, current City of Dayton Mayor Nan Whaley).  Williams indicated the Dayton businessman had donated maybe $50,000 to her campaign and $25,000 that never made it in the campaign.

31.  Based on my training and experience, as well as discussions with other agents, I know that the following items often are kept at the residences of individuals (including Williams) who accept bribes and other payments in exchange for attempting to influence the decisions of their government agencies:

a.    The actual goods or payments that the individual received in exchange for attempting to influence the decisions of their government agencies.  For instance, in this case, Williams received thousands of dollars in home improvements, which still exist and can be found throughout this residence.  Because the home improvements cannot be physically seized, it

often proves crucial for investigators to obtain photographic evidence of the benefits that an individual accepted.

b.    Ledgers, books, spreadsheets, journals or other records documenting payments received, services provided, or other benefits that an individual has accepted in exchange for attempting to influence the decisions of his or her government agencies;

c.    Invoices, receipts, plans, drawings, brochures or other documentation concerning, reflecting, or relating to, the home improvement project that CHS-5 completed at Williams's residence, including payments to subcontractors;

d.    Any documentation, including e-mails, text messages, letters, reflecting any communications between Williams and any City of Dayton employee or officials, including City of Dayton component CityWide, concerning CHS-5's company or CHS-5.

e.    Telephone (both landline and cellular) records, including, but not limited to, billing information, toll records, identity of service providers, and form of payment for those services.  Based on my training and experience, these records, which individuals routinely keep at their home, confirm the telephonic contact between Williams and CHS-5.

Additionally, such records confirm contacts between Williams and City of Dayton officials; similarly, this type of documentation also establishes potential patterns of contact between Williams and other individuals who may be making payments to him.

    f.    Bank statements, credit card statements, tax records, check ledgers, or any other financial record reflecting income, spending patterns, purchases, cash transactions, etc. Such records, which individuals routinely keep at their residence, help investigators identify unusual sources of income or expenditures as well as unexplained wealth indicative of criminal activity, including accepting bribe payments.

    g.    Bulk cash ($500 or more).  Based on my training and experience, individuals often solicit or accept bribe payments in the form of cash as U.S. currency often proves difficult to trace.

    h.    Contact lists, address books, rolodex that identify persons with whom Williams has contact.

    i.    City of Dayton documents, including, but not limited to, rules of conduct for employees or city officials, bid proposals on city contracts, information concerning past, pending, or future contracts or bids for city projects or work.

j.    Records, receipts, binders, photographs, or any documentation of any work (including but not limited to, repairs, construction, painting, demolition or other home improvements) performed at 1229 Sunnyview Avenue, Dayton, Ohio.

k.    Documentation or records reflecting indicia of ownership and occupancy at 1229 Sunnyview Avenue, Dayton, Ohio.

l.    Documentation concerning any business entities or ventures that could potentially generate income for Williams.

m.    Keys to, records for, or documents concerning safe deposit boxes or storage facilities.  I know that individuals often keep illicitly obtained money or goods in secure locations.

32.  Based on my training and experience, I also know that individuals who accept bribe payments often perform research on the internet through search engines such as Google and Yahoo! concerning the person or entity from whom they are accepting a bribe payment or other benefit.  Individuals do so in an effort to determine the wealth of the person from whom they are accepting a bribe as well as to confirm that the person is not working for law enforcement.  Additionally, individuals often use the internet to confirm that value of the items that they are receiving as a bribe payment.  Finally, I know that, in this

35

modern era, individuals often maintain the records and documentation described above in Paragraph 31 in electronic format on computers, smart phones, tablets, and other electronic storage devices.  For instance, individuals often maintain electronic ledgers of payments, expenditures, etc.

33.  More precisely, as described above and in Attachment B, this application seeks permission to search for records that might be found on the premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

a.  I submit that if a computer or storage medium is found on the search premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

(1)  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have

been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

(2) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

(3) Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

37

(4)  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

b.  Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

(1)  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the

38

times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

(2)  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

(3)  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

(4)  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an

accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

(5)  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

34.  Necessity of seizing or copying entire computers or storage media.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking,

imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires

41

tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

35. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

36.  Based on the foregoing, I believe there is probable cause to believe that evidence, contraband, fruits of a crime, other items illegally possessed as well as property designed for use, intended for use, or used in committing violations of federal law exists and can be found at the following location:

a.  The residence located at 1229 Sunnyview Avenue, Dayton, Ohio, including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location.  1229 Sunnyview Avenue, Dayton, Ohio is more fully described in Attachment A, and Attachment A is incorporated herein by reference.

Further affiant sayeth naught,

Lance Kepple
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me this ___14th___ day of September, 2015.

The Honorable Sharon L. Ovington
Chief United States Magistrate Judge

43

<u>Attachment A</u>



**<u>Address</u>**

1229 SUNNYVIEW AVE, DAYTON, OH 45406, including any including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location. The property is more fully described as a residence located on a private drive that is shared by several other homeowners. The exterior of the residence is brick with dormers on the roof. It should be noted that stone pillars have been added to the front door. In addition, the walkway between the house and garage has recently been enclosed and covered with stone that matches the front door pillars. The new room is accessible from the outside through French doors. Other recent upgrades to the property include patio pavers and a concrete basketball court. The residence is depicted above.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Evidence of a crime, contraband or fruits of a crime, and property designed for use, intended for use, or used in committing a crime – namely, violations of 18 U.S.C. § 666 (theft or bribery concerning programs receiving federal funds) Items to be seized include, but are not limited to, the following documents and records whether in paper form or in the form of computerized electronic data, covering the period beginning January 1, 2010 through the present time:

1.  The actual goods and home improvements that Williams received from CHS-5.

2.  Ledgers, books, spreadsheets, journals or other records documenting payments received, services provided, or other benefits that Williams may have accepted in exchange for attempting to influence the decisions of his government agencies.

3.  Invoices, receipts, plans, drawings, brochures or other documentation concerning, reflecting, or relating to, the home improvement project that CHS-5 completed at Williams's residence, including payments to subcontractors.

4.  Any documentation, including e-mails, text messages, letters, reflecting any communications between Williams and any City of Dayton employee or officials, including City of Dayton component CityWide, concerning CHS-5's company or CHS-5.

1

5.   Telephone (both landline and cellular) records, including, but not limited to, billing information, toll records, identity of service providers, and form of payment for those services.

6.   Bank statements, credit card statements, tax records, check ledgers, or any other financial record reflecting income, spending patterns, purchases, cash transactions, etc.

7.   Bulk cash ($500 or more).

8.   Contact lists, address books, rolodex that identify persons with whom Williams has contact.

9.   City of Dayton documents, including, but not limited to, rules of conduct for employees or city officials, bid proposals on city contracts, information concerning past, pending, or future contracts or bids for city projects or work.

10.  Records, receipts, binders, photographs, or any documentation of any work (including but not limited to, repairs, construction, painting, demolition or other home improvements) performed at 1229 Sunnyview Avenue, Dayton, Ohio.

11.  Documentation or records reflecting indicia of ownership and occupancy at 1229 Sunnyview Avenue, Dayton, Ohio.

12.  Documentation concerning any business entities or ventures that could potentially generate income for Williams.

2

14.  Keys to, records for, or documents concerning safe deposit boxes or storage facilities.

15.  Any and all of the information described above that may be stored on magnetic media. This includes information stored on computer hard drive, diskettes, tapes, USB drives or any other media capable of storing information in a font readable by a computer. This also includes all copies of the information described above that may be stored on such media as archive or backup copies.  The agents searching for such information are authorized to search:

a.  Computer system hardware, including: word processing equipment, modems, printers, plotters, encryption circuit boards, optical scanners, personal digital assistants, cell phones, and other computer related devices, and software including floppy disks and any other medium which is capable of storing magnetic tape or optical coding, software programs, and any other programs, or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission, computer manuals relating to the operation of a computer system, computer software, and/or any related device;

b.  The computer system hard drive and/or server; and associated electronic storage media to include, but

not limited to the following: floppy diskettes, CD-ROMs, optical disks, and other removable storage media. If possible, a mirror-image electronic copy of the entire storage device will be made at subject search locations and then later be recreated to a working copy of the storage device off-site for review. In the event that the agents cannot, for technical reasons, obtain access to any subject computer or cannot search for or copy information contained on that computer, whether this be technically too difficult or time consuming, the agents are then seeking authorization to seize such computers and remove them from the premises for a sufficient period of time to obtain access to, search for, and recover the files and review its contents off-site. In addition, if the files and records cannot be read and understood without the software or programs that created those files or records, the agents are authorized to seize such software and any documentation and manuals that describe the software and give instructions on its installation and use. The agents searching for such information are authorized to search: (a) Any desktop or other "personal computer" in the residence or office, to copy all of the above referenced information stored on such computer(s) or accessible through such computers, if connected to other computers through a network of computers, and diskettes or tapes found in such offices or work area; (b) Any file, storage area or directory on

4

a network server to copy any and all of the above described information that may be found on such computer, and any diskettes or tapes that may contain such information; and (c) Any other storage area of any file server or computer, which the information described above, might be found or stored. The search of such computers or storage areas of such computers shall be limited to seeking information that fit within the above-described information.

c.  In the event that the agents cannot, for technical reasons, obtain access to any subject computer or cannot search for or copy information contained on that computer, the agents are then authorized to seize such computer and remove it to a laboratory setting for a sufficient period of time to obtain access to, search for, and recover the files and records described herein. In addition, if the files and records cannot be read and understood without the software or programs that created those files or records, the agents are authorized to seize such software and any documentation and manuals that describe the software and give instructions on its installation and use.

ATTACHMENT C

